Jack **MARTINEZ** et al., Plaintiffs,

v.

**PHILLIPS PETROLEUM COMPANY,** a Delaware corporation, Defendants.

Civ. No. 4–66–8.

United States District Court
D. Idaho, E. D.
April 11, 1968.

McClenahan & Greenfield, Boise, Idaho, for plaintiffs.

Merrill & Merrill, Wesley F. Merrill, Pocatello, Idaho, Bogle, Gates, Dobrin, Wakefield & Long, J. Tyler Hull, Dustin C. McCreary, Seattle, Wash., for defendant.

## MEMORANDUM DECISION

McNICHOLS, District Judge.

This is an action for damages brought by Jack Martinez and Joe Talbot on behalf of themselves and on behalf of the 106 consenting plaintiffs similarly situated, as plaintiffs, against their employer, Phillips Petroleum Company, as defendant. The action is for overtime compensation allegedly owing to plaintiffs as a result of their employment by defendant under a contract between defendant and the United States Atomic Energy Commission.

The complaint, which consists of two counts, alleges two causes of action. Briefly, Count One alleges overtime liability arising under the Fair Labor Standards Act (29 U.S.C. § 217) because of defendant's alleged failure to pay for hours worked in excess of forty per week and for liquidated damages, costs, interest and attorneys' fees. (29 U.S.C. § 216(b).) Count Two alleges overtime liability arising under the Eight-hour Law (40 U.S.C. §§ 321–326) because of defendant's alleged failure to pay for hours worked in excess of eight per day.

Federal jurisdiction is invoked under Section 216(b) of the Fair Labor Standards Act which confers original jurisdiction on all federal and state courts to adjudicate actions to recover unpaid overtime compensation required by said Act. Because both causes of action arise from the same employment and same facts and circumstances, this Court, having primary jurisdiction over plaintiffs' claim under the Fair Labor Standards Act, also has an incidental or pendent jurisdiction to adjudicate the issues raised in Count Two of the Complaint. As a matter of fact, defendant does not, as to Count Two, contest the jurisdiction of the Court based upon the jurisdictional amount required by 28 U.S.C. § 1331, but does contest jurisdiction of the Court over the subject matter of this action and issues existent thereon as will be more fully detailed later.

This matter is submitted for determination on the merits. All issues are

raised in the Complaint and Answer. However, the issues are, by agreement, limited to those dealing with the liability of the defendant. In the event the liability question or questions are determined adversely to the defendant, and the Court finds plaintiffs are entitled to recover damages, the parties have reserved the right to raise any and all issues relating to damages or the amount thereof in a subsequent proceeding. An agreed statement of facts was substituted for the taking of formal evidence. Briefs and reply briefs have been filed by the parties and carefully considered by the Court.

The Court adopts as Findings of Fact the "Admitted Facts" as set out in the pre-trial order filed herein on April 21, 1967, beginning with paragraph III, at page 5 thereof, which admitted facts are, by reference made a part hereof as though fully set forth herein. A generalization of these underlying facts will, it is felt, lead to a clearer understanding of the Court's determination of the questions submitted.

At all times material to this action, defendant was under a contract with the United States Atomic Energy Commission (hereinafter called "AEC") to perform certain functions for the AEC in conjunction with the National Reactor Testing Station (hereinafter called "NRTS") located near Idaho Falls, Idaho. Commencing on various dates under a subsequent modification of the contract, executed September 1, 1953, defendant provided until June 30, 1966, certain services which could be characterized as housekeeping services for the AEC at and in conjunction with the NRTS. However, the contract did not cover all housekeeping services at or in conjunction with the NRTS. Subsequently, completely renegotiated, rewritten agreements (modifications) between defendant and the AEC, pursuant to which defendant undertook to perform certain services, together with other functions, were executed on or about March 27, 1957, and September 29, 1961. Following June 30, 1966, defendant has not had a contract with the AEC under which defendant performs "housekeeping" services at or in conjunction with the NRTS.

Included in the "housekeeping" services was the operation of a bus transportation system, for the purpose of transporting the NRTS employees working at the site to and from work, and also transporting mail and freight to and from the site.

Initially, the Lost Rivers Transportation Company (hereinafter called "Lost Rivers") operated the bus transportation system pursuant to a contract with the AEC which became effective May 2, 1951 and terminated June 30, 1952. In the spring of 1952, the contract was extended to 1956. This contract was modified numerous times until it was terminated September 30, 1953.

In early 1953, the Idaho Operations Office of the AEC had under consideration the question of consolidation under a single contractor certain functions being performed by several contractors or the AEC itself. The consolidation considered would include (a) the Materials Testing Reactor operated by Phillips; (b) the Chemical Processing Plant operated by American Cyanamid Company, (c) central shops and maintenance services previously performed by National Industrial Maintenance Co., but in 1953 being performed by Lost Rivers under an interim agreement with the AEC; (d) the bus transportation system operated by Lost Rivers; (e) the warehousing and procurement, central library and document control, and reproduction services being performed by AEC personnel. Concluding that the consolidation of these activities would achieve a more economical program, the AEC invited American Cyanamid Company and Phillips to submit proposals for the projected consolidated operation.

Phillips was selected to be the contractor for the consolidated functions, and the Phillips-AEC contract which covered the Materials Testing Reactor, was renegotiated and rewritten on September 1, 1953 so as to include the consolidated functions.

The AEC-owned and leased buses which had been utilized by Lost Rivers were continued in use by Phillips and a number of real estate leases for parking lots, pickup stations, etc. were formally assigned by Lost Rivers to Phillips. The Lost Rivers Project Manager, Howard A. Davis, and substantially all of his staff, including drivers, transferred to Phillips. Phillips commenced operating the transportation system on October 1, 1953, and the Lost Rivers-AEC contract was terminated effective September 30, 1953. Phillips continued to operate the transportation system through June 30, 1966.

Each of the plaintiffs was, at one time or another following April 14, 1960, employed as a bus driver by defendant Phillips.

As mentioned above, the plaintiffs launch a two-pronged attack under Count One and Count Two of the Complaint. For the purpose of this decision, the Court will firstly dispose of Count Two.

## COUNT TWO

Under Count Two of the Complaint, plaintiffs allege that they were employed by defendant for work days in excess of eight hours but that defendant, in violation of the Eight-hour Law (40 U.S.C. §§ 321–326), failed to compensate them for such excess time at the rate of one and one-half times their regular rate of pay. Under Count Two, plaintiffs allege that as a result of defendant's alleged violation of the Eight-hour Law, the sum of at least $300,000 is due and owing to them, and demand judgment for all sums which may be found owing to them, together with interest and costs.

The parties stipulate that nine issues of law arise under Count Two of the Complaint, which are numbered 8 through 16, inclusive. Issues 8 and 9 read as follows:

"8. Does the court have jurisdiction over the subject matter of Count Two of this action?"

"9. Have plaintiffs stated a claim upon which relief can be granted?"

Defendant takes the position that the Court does not have jurisdiction over the subject matter of Count Two of plaintiffs' action and that plaintiffs have failed to state a claim upon which relief can be granted because (1) the Eight-hour Law does not authorize or provide employees with a right to action against their employer for alleged violations thereof; and (2) plaintiffs have no right to bring this action as third party beneficiaries of either the AEC-Phillips contract or the collective bargaining agreement between Amalgamated Division 1517 (a labor union) and Phillips.

The plaintiffs contend that the Court does have jurisdiction over the subject matter of Count Two and that they have stated a claim upon which relief can be granted because (1) their right to bring this action is necessarily implied in the Eight-hour Statute, (2) they have the right to bring this action as third party beneficiaries of the Phillips-AEC contract, and (3) the provisions of the Eight-hour Law form a part of the collective bargaining agreement between Phillips and Amalgamated Division 1517, by operation of law, and consequently, plaintiffs have the right to bring this action as third party beneficiaries of that contract and jurisdiction is conferred upon this Court by reason of § 301 of the Labor-Management Relations Act of 1947, as amended (29 U.S.C. § 185).

Turning to the first question, i. e., whether or not plaintiffs have standing to sue under the Eight-hour Law, it is found that no controlling authority for either position has been presented to this Court. The scant case law that is provided only shows that there is a split of authority as to the question involved. Only two federal cases have been cited by the parties which deal with the precise question involved. Veader v. Bay State Dredging & Contracting Co., 79 F.Supp. 837 (D.Mass., 1948), held that the Eight-hour Law was the source of private suits. On the other hand, Willis v. E. I. Du Pont De Nemours & Co., 76 F.Supp. 1010 (E.D.Oklahoma, 1948), held

that the Eight-hour Law gives no right of action in the employee.

It is interesting to note that both of the above mentioned cases were reversed or remanded on other grounds. The Supreme Court expressly left the question open in Foley Bros., Inc. v. Filardo, 336 U.S. 281, 69 S.Ct. 575, 93 L.Ed. 680 (1949).

The parties agree that the Eight-hour Law itself does not expressly confer a right of action upon employees.

■ This Court is of the opinion that the Eight-hour Law does not authorize or provide employees with a right of action against their employer for alleged violations of the Eight-hour Law. It seems to this Court that had Congress intended to provide a right of action in individuals under the Eight-hour Law, it would have specifically done so. The Eight-hour Law is one of a group of statutes governing the relationships between the government and those with whom it deals. This group includes the Eight-hour Law, the Walsh-Healey Public Contracts Act (41 U.S.C.A. §§ 35-45), and the Davis-Bacon Act (40 U.S.C.A. § 276a et seq.).

Each of the above mentioned statutes set forth certain requirements that are to be met when the government enters into various types of contracts. Each statute provides for specific remedies to be allowed if those requirements are not met. A party violating the Walsh-Healey Public Contracts Act is liable to the government for liquidated damages in a certain amount, and the government has the right to cancel the contract, enter into a new contract, and charge additional costs to the violating contractor. (41 U.S.C.A. § 36). Sums that are withheld or recovered as deductions, rebates, refunds or underpayment of wages are to be held in a special deposit account and are then paid, on order of the Secretary of Labor, directly to the employees who have been paid less than minimum rates of pay as set forth in such contracts and on whose account such sums were withheld or recovered. Employees must enter their claims for such payments within one year from the date of actual notice to the contractor of the withholding or recovery of such sums by the United States. (41 U.S.C.A. § 36.)

The courts have consistently held that the Walsh-Healey Act does not confer upon employees a right of action because the only right to action provided in that Act is one brought by the Attorney General of the United States to recover liquidated damages due the United States for violations. See e. g., United States v. Lovknit Mfg. Co., 189 F.2d 454 (C.A. 5th Cir., 1951); United States v. Harp, 80 F.Supp. 236 (W.D.Okla., 1948); United States v. W. H. Kistler Stationery Co., 200 F.2d 805 (C.A.10th Cir., 1952).

The Davis-Bacon Act requires that the prevailing minimum wages as established by the Secretary of Labor be paid to mechanics and laborers working on the site of a federally financed construction or repair project whose specifications call for an expenditure in excess of $2000. Failure to pay prevailing wages in the area results in withholding from the contractor so much of accrued payments as are necessary by the Contracting Officer to pay the difference. (40 U.S.C.A. § 276a.) When it is found by the Contracting Officer that lesser rates of wages are being paid, the government may terminate the right of the contractor to proceed. The Comptroller-General is authorized to pay from the wages withheld the amounts due to the laborers and mechanics. However, if the amounts so withheld are insufficient to reimburse wages due to laborers and mechanics, then " * * * such laborers and mechanics shall have the right of action and/or of intervention against the contractor and his sureties conferred by law upon persons furnishing labor or materials, * * * ". (40 U.S.C.A. § 276a–2(b).)

■ Thus, under the Davis-Bacon Act, it is crystal clear that employees have a cause of action against the contractor or his sureties to recover wages due if certain circumstances are present.

**520**

No such language is present in the Eight-hour Law. Indeed, plaintiffs admit that the Eight-hour Law does not expressly confer a right of action upon laborers and mechanics. They contend, however, that such right is to be implied because of the nature of the statute. Alternatively, plaintiffs claim that they are entitled to recover in this case upon the theory that they are third party beneficiaries of the Phillips-AEC contract. This Court cannot agree with either of those contentions.

Basically, the Eight-hour Law provides that every contract to which the United States is a party which may require or involve the employment of laborers and mechanics, shall contain a provision that the working day of such laborers and mechanics be limited to eight hours. It is also required that said contracts stipulate a penalty of $5 per day for each laborer or mechanic that is permitted or required to work more than eight hours a day. When it is found that the eight hour provision has been violated, the amount of the penalties imposed according to the stipulation in the contract are withheld from the contractor or subcontractor " * * * *for the use and benefit of the United States, * * *." (Emphasis added.) 40 U.S.C.A. § 324.

Section 324 goes on to provide any *contractor or subcontractor* aggrieved by the withholding of any penalty the right to appeal to the head of the department making the contract on behalf of the United States who is given the power to review the action imposing the penalty. No remedies are conferred to laborers or mechanics.

Section 325 of the Eight-hour Law provides for certain exceptions to its application and for waiver to its terms by the President under certain circumstances.

Section 325a of the Eight-hour Law, enacted in 1940, provides that the wages of every laborer and mechanic shall be computed on a basic day rate of eight hours per day and work in excess of eight hours per day shall be permitted upon compensation for all hours worked in excess of eight hours per day at not less than one and one-half times the basic rate of pay. Nowhere in this section is found a remedy giving individual employees a right of action to recover overtime wages.

■ It seems clear from reviewing the Eight-hour Law that the remedy provided by Congress was a penalty of a specified amount, to be imposed by the government agency involved, with an appeal by the aggrieved contractor to the head of the government agency involved, and a right for a contractor aggrieved by the imposition of such a penalty to sue in the Court of Claims. This remedy is clearly set forth in the Eight-hour Law as are the remedies provided under the Walsh-Healey Public Contracts Act and the Davis-Bacon Act.

This position is further supported by reviewing the Contract Work Hours Standards Act (40 U.S.C.A. §§ 327–332) which was enacted in 1962. This Act repealed the prior Eight-hour Law provisions (40 U.S.C.A. § 321–326). The Contract Work Hours Standards Act applied prospectively 60 days after its enactment, and therefore, has no application to the Phillips-AEC contract which is before the Court.

The Contract Work Hours Standards Act specifically provides a cause of action in individual employees against the contractor responsible for violations of its terms. (40 U.S.C.A. § 328(b)). The specific penalties due the United States for violations were also retained. The Act also authorized the Comptroller General to

" * * * pay directly to such laborers and mechanics, from the sums withheld on account of underpayments of wages, the respective amounts administratively determined to be due, if the funds withheld are adequate, and, if not, an equitable proportion of such amounts." (40 U.S.C.A. § 330(a).)

Thus, it seems quite apparent that the Act of 1962 includes additional remedies which Congress had not inserted or contemplated in the prior Eight-hour Laws.

■ Plaintiffs urge the Court to "imply" a cause of action and remedy which Congress specifically omitted. This the Court feels it may not do, and consequently, plaintiffs' contention that they have standing to sue under the Eight-hour Law by implication must fail.

Similarly, plaintiffs' contention that they qualify as third party beneficiaries under the contracts involved and as such have standing to sue under the Eight-hour Law is not persuasive to the Court.

■■ It seems quite well settled as a matter of general law that before recovery can be had by a third party beneficiary, it must be shown that the contract was made for his direct benefit, and it is not sufficient that he be a mere incidental beneficiary. German Alliance Ins. Co. v. Home Water Supply Co., 226 U.S. 220, 33 S.Ct. 32, 57 L.Ed. 195 (1912); Robins Dry Dock and Repair Co. v. Flint, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927); Dawson v. Eldredge, 84 Idaho 331, 372 P.2d 414 (1962). It seems to the Court that plaintiffs have failed to meet this basic requirement in the case at bar. As mentioned above, it is the opinion of this Court that plaintiffs do not have standing to sue under the provisions of the Eight-hour Law. Said Law merely set forth standards and requirements to be followed when the Federal Government enters into contracts with certain contractors and sub-contractors for the purpose of carrying out certain governmental housekeeping duties. Violations of the Eight-hour Law give rise to specified statutory penalties which are assessed and collected by the Federal Government for the direct benefit of the Federal Government. The eight-hour provisions are not for the *direct* benefit of individual employees, and thus, they have no rights to recovery under the theory that they are third party beneficiaries. Even conceding that such employees could be regarded as incidental beneficiaries under said eight-hour provisions, they could still not prevail as this Court interprets the law.

As the result of the above, Issues of Law numbers 8 and 9 must be answered in the negative. Even though the above Finding is dispositive of Count Two of the Complaint, the Court feels it is necessary to decide the question set forth under Issue of Law number 10 in the event that upon appeal it is found that this Court decided Issues 8 and 9 erroneously.

Issue of Law number 10 states:

"10. Does the contract between defendant and the United States Atomic Energy Commission, or that portion of it which requires defendant to operate and maintain a transportation system serving the NRTS and the Idaho Operations Office of the AEC (Exhibit 2) fall within the 'contract for transportation by land' exemption, within the meaning of section 325 of the Eight-hour Law (40 U.S.C.A. 321–326) which, by virtue of said section 325 exempts it, or portions of it, from the requirements of said law?"

The defendant contends that said contract or said portion of said contract falls within the exemption provided by § 325 of the Eight-hour Law. The plaintiffs, on the other hand, contend that said contract or said portion of said contract does not fall within that exemption.

The pertinent part of § 325 provides that:

"Nothing in section 324 of this title shall apply to contracts for transportation by land or water, * * *"

The parties have not presented any judicial interpretation of the transportation exemption of § 325 to the Court. Apparently none can be found, and it would appear, therefore, that this issue presents a question of first impression. It does appear, however, that the stipulated evidence presented to this Court provides a sufficiently clear picture upon which a sound decision can be made.

During the history of the transportation system at the NRTS, several opinions relating to the coverage of the bus drivers by the Eight-hour Law had been issued by various governmental officials.

In December, 1952, at which time the transportation system was being operated by Lost Rivers, the Assistant Solicitor of the Department of Labor, Donald M. Murtha advised in a letter to Clarence M. Beck, an attorney for Teamsters Local 983 (then collective bargaining representative for the bus drivers and service station men employed by Lost Rivers) that upon the facts available to him, the bus drivers were exempt from the Eight-hour Law by the provision of § 325 which exempts contracts for transportation by land. (Exhibit 25, admitted facts, hereinafter referred to by exhibit numbers.)

More than nine years later, at a time when Phillips was operating the transportation system which it inherited from Lost Rivers pursuant to the contract which gave Phillips various housekeeping duties at the NRTS, another interpretation is noted. In a letter dated October 25, 1962, Kenneth C. Robertson, Regional Attorney of the Solicitor of Labor, purported to inform Mr. Burbick, President of Local Division 1517, among other things, that the transportation exemption was not applicable to the bus drivers because the transportation services were an incidental portion of the overall facilities maintenance contract. (Exhibit 43.)

Apparently Mr. Burbick then alleged a violation of the labor contract on the basis of the letter he received from Mr. Robertson, for on January 17, 1963, E. Erving Manger, Associate Administrator for the Solicitor of Labor, sent a letter to Oscar S. Smith, Director of Labor Relations of the AEC, informing him of the alleged labor violation, and requesting that the AEC conduct an investigation in order to ascertain whether the alleged violations of the Eight-hour Law occurred. Smith was to inform the Labor Department of the results of the investigation as provided by the Department of Labor Regulations. Mr. Manger indicated that his department did not have sufficient information on which to base a determination, and that was why he was requesting the investigation.

Pursuant to the request of January 17, 1963, Edward J. Block, Assistant General Manager for Operations, AEC, sent a detailed letter to Charles Donahue, Solicitor of Labor. The letter, dated March 12, 1963 (Exhibit 48), contained a detailed chronological development of the facts surrounding the situation, and also a statement of the basis on which the AEC considered the Eight-hour Law to be inapplicable to the bus drivers.

On July 29, 1963, Charles Donahue, Solicitor of Labor, wrote a letter to Mr. Block, concerning the applicability of the Eight-hour Law to the bus drivers employed by Phillips under its contract with the AEC. Mr. Donahue indicated that he had reviewed Mr. Block's letter of January 17, and also a memorandum submitted by Charles V. Huppe, the representative of the local union representing the bus drivers. Thus, it appears that Mr. Donahue had before him a complete set of facts presented by all parties in interest. It is appropriate at this time to quote at length from Mr. Donahue's letter to show that his department was fully aware of facts and circumstances surrounding the situation involved. The letter states in part:

"* * *

"The former contract with Lost Rivers, which was the subject of the opinion of December 3, 1952, was essentially and primarily a contract for the performance of a transportation service. To the extent that it involved the employment of laborers and mechanics in performing the transportation called for and incidental related services, it was considered excepted from the requirements of the Eight-hour Laws of 1912 and 1940 as a contract for transportation within the meaning of 40 U.S.C. 325. A simple substitution of Phillips for Lost Rivers in such a contract would not have changed its character. The question presented here is whether, in the light of the history outlined in your letter and its attachments and the information furnished by Mr. Huppe, the provision made in the overall contract between the AEC and Phillips with respect to performance of this function became so

assimilated into the other obligations of that contract as to lose its identity as a contract for transportation and became a mere incident of a contract of a wholly different kind.

"We agree with you that the separate contractual obligation to provide transportation services as set forth in the present contract retains the character of a contract for transportation within the exception in 40 U.S.C. 325 notwithstanding the fact that various other separate and distinct contractual obligations of the same contractor are, for the convenience of the Government, included in the same contract document. Although the contractor is engaged in performing a wide variety of functions for the Government at the installation, the fact that the transportation performed under this contract provision is not a mere incident of its performance of these other functions under the contract is underscored by the fact that, as your letter states, only between 40 and 45 percent of the persons transported are employed by the contractor. Much of the transportation is on the public highways. Mail and freight for others than the contractor are also transported on the buses. The contract obligation to provide transportation service which is set forth in paragraph (4) of Article III–A of the current contract is complete in itself and could stand alone as a contract for transportation if the other references to the other work within the scope of the contract were deleted. Furthermore, we do not consider the information furnished by Mr. Huppe to be in conflict with this view. Under these circumstances we are constrained to conclude that the laborers and mechanics employed by the contractor in driving buses pursuant to this provision of the contract and in performing mechanical and other services incidental to the transportation service contracted for are exempt from the provisions of the Eight-hour Laws of 1912 and 1940 under 40 U.S.C. 325, and would, in the case of a like contract entered into after October 12, 1962, be similarly exempt from the requirements of the Contract Work Hours Standards Act under the terms of section 103(b) of that Act which provide a corresponding exemption for transportation contracts." (Exhibit 50.)

" * * *."

■ Thus, it must be accepted that the Department of Labor and the AEC both ruled or determined that the bus drivers employed by Phillips were exempt from the provisions of the Eight-hour Law. It seems that the plaintiffs' only rebuttal to these determinations is that they were incorrect. The plaintiffs do not allege or attempt to present to this Court any facts or evidence that was not before the Department of Labor when it made its determination. They do not allege that the actions taken by the Department of Labor were arbitrary or capricious, or that the Regulations promulgated by the Department of Labor for the administration of the labor laws were not properly followed. In this posture of the matter, it is very difficult to imagine how or why this Court should now hold that all of the prior administrative rulings and determinations were erroneous, and find, instead, that the exemptions under the Eight-hour Law did not apply to the bus drivers involved. Consequently, those determinations and rulings must stand. It follows that Issue of Law No. 11 must be answered in the affirmative.

Inasmuch as the above Findings are dispositive of Count Two of the Complaint, it becomes unnecessary to discuss the remaining issues enumerated thereunder. Defendant prevails as to Count Two.

## COUNT ONE

Under Count One of the Complaint, plaintiffs allege that defendant violated the Fair Labor Standards Act (hereinafter referred to as "FLSA"), 29 U.S.C.A. § 217, by failing to compensate them at the rate of one and one-half times their regular rate of pay for work hours performed in excess of forty per week.

They seek overtime wages allegedly owing to them, liquidated damages, and attorneys' fees, pursuant to section 16(b) of the FLSA.

Under Count One, seven issues of law are propounded as stipulated between the parties. Issue of Law No. 1 states:

"1. Do the provisions of section 10 of the Portal to Portal Act of 1947 (29 U.S.C. section 259) relieve the defendant of liability and bar the action of plaintiffs under Count One of the Complaint?"

The defendant contends, as provided for in section 10 of the Portal to Portal Act of 1947, that its failure to pay overtime compensation was in good faith in conformity with and in reliance on one or more written administrative regulations, orders, rulings, approvals, and/or interpretations issued with respect to defendant's bus system operation serving the NRTS (and/or with respect to Lost Rivers' operation of said bus system) by the agency of the United States specified in said statute for the FLSA, and on administrative practices or enforcement policies of such agency, all with respect to the class of employers to which defendant belonged.

The plaintiffs deny this and contend that the good faith reliance required by section 10 of the Portal to Portal Act of 1947 does not apply in this case because the defendant has not and cannot show any regulation, order, ruling, approval or interpretation of the Administrator of the Wage and Hour Division of the Department of Labor upon which it did or could have relied.

Section 10 of the Portal Act provides in pertinent parts as follows:

"(a) In any action or proceeding based on any act or omission on or after May 14, 1947, no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay * * * overtime compensation under the Fair Labor Standards Act * * *, if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States specified in subsection (b) of this section, or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect.

"(b) The agency referred to in subsection (a) of this section shall be—

"(1) in the case of the Fair Labor Standards Act * * * the Administrator of the Wage and Hour Division of the Department of Labor; * * *."

It seems very clear that the above section was enacted to insure that no employer would be subject to liability for overtime pay where he had acted in good faith in accordance with certain rulings, practices and policies of specified government agencies. Essentially the FLSA requires payment of overtime compensation, at one and one-half the employee's regular rate of pay, for hours worked in excess of 40 in a workweek (29 U.S.C.A. § 207). However, Section 213(b) contains numerous exemptions from the overtime requirements of the Act, including § 213(b) (1) which provided at times pertinent to this case as follows:

"(b) The provisions of section 207 of this title shall not apply with respect to—

"(1) any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 304 of Title 49;" (Motor Carrier Act).

In order to dispose of the difficult question set forth in Issue No. 1, it is

necessary to review the relevant facts surrounding said issue beginning at the time Lost Rivers commenced operating the transportation service serving the NRTS in May, 1951. At that time, under the Lost Rivers-AEC contract, the bus drivers were being paid time and one-half for hours worked in excess of eight in a workday and forty in a workweek.

On July 19, 1951, Teamsters Local #983 was certified by the National Labor Relations Board as the collective bargaining representative of the bus drivers, and in December of that year a collective bargaining agreement was negotiated between the bus drivers and Lost Rivers which also provided for overtime compensation.

In August of 1952, the bus drivers agreed to demand a new collective bargaining agreement and gave their notice of intention to open the 1951–52 Agreement. Included in the initial proposals for the new agreement was a request for overtime compensation. However, during negotiations the bus drivers through their Union, withdrew the demand for overtime compensation, in favor of a straight time basis of pay. The reason for this change was to obtain greater total increases in wages and benefits from Lost Rivers and to distribute total earnings more equally among drivers. It was, however, agreed upon by the parties that overtime compensation could not be discontinued unless approved by the United States Department of Labor.

Pursuant to this agreement, the Union, through its attorneys, sent a letter dated November 8, 1952 (Exhibit 23), to William R. McComb, then Administrator of the Wage and Hour and Public Contracts Division, Department of Labor. This letter sought a ruling with respect to the applicability of the FLSA, as well as the Eight-hour Laws, to the bus drivers. All the relevant facts concerning the operation of the bus system were contained in the letter.

In response to the letter of November 8, 1952, William R. McComb in a letter dated November 26, 1952 (Exhibit 24), made the following statement with regard to the applicability of the FLSA to the bus drivers:

"* * * The section 13(b) (1) exemption may, however, be applicable to certain of the Company's employees. This exemption extends to drivers, drivers' helpers, loaders, and mechanics who (1) are employed by carriers whose transportation of passengers or property by motor vehicle is subject to the jurisdiction of the Interstate Commerce Commission under section 204 of the Motor Carrier Act and (2) engaged in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act. As I indicated previously, the transportation of mail by the Company which, though confined to Idaho, is part of an interstate movement thereof constitutes interstate commerce within the meaning of the Fair Labor Standards Act. You will note from section 782.7 of the enclosed Interpretative Bulletin that, as an enforcement policy, this Department assumes that such a movement in interstate commerce under the Fair Labor Standards Act is also a movement in interstate commerce under the Motor Carrier Act, except where the Interstate Commerce Commission or the courts hold otherwise. The Commission has disclaimed jurisdiction under the Motor Carrier Act of employees engaged in the transportation of mail under contract with the Post Office Department in vehicles used exclusively for that purpose. This disclaimer would appear inapplicable to the factual situation which I understand to exist here. *The facts which I have would thus indicate that, pursuant to the foregoing enforcement policy, drivers, drivers' helpers, loaders, and mechanics employed by the Company in work directly affecting the safety of operation of motor vehicles in the transportation on public highways of mail*

*in interstate commerce would be considered entitled to the 13(b) (1) exemption.* This does not prejudice any rights of such employees under section 16(b) of the Act." (Emphasis added.)

It is undisputed that following receipt of the rulings from William R. McComb and Donald M. Murtha (the latter concerned the applicability of the Eight-hour Law), the Teamsters Local 983 negotiating committee took the position that neither the FLSA nor the Eight-hour Laws applied to the bus drivers employed by Lost Rivers and so advised Mr. Howard A. Davis of Lost Rivers.

Thereafter, on February 6, 1953, Teamsters Local and Lost Rivers executed a collective bargaining agreement which provided for a straight-time basis of compensation for bus drivers. Lost Rivers continued with that basis of pay until the contract with the AEC terminated on September 30, 1953. On October 1, 1953, Phillips took over the operation of the transportation system at the NRTS. The terms of the agreement of February 6, including straight-time pay, were followed by Phillips until September 3, 1954.

■ The first question that arises is whether the November 26, 1952, letter of the Administrator, Wage and Hour Division, met all of the requirements of Section 10 of the Portal Act. Plaintiffs contend that said letter was "vague, contradictory and conditional", and could not possibly amount to a formal first ruling that the Portal Act requires.

"The term 'ruling', commonly refers to an interpretation made by an agency 'as a consequence of individual requests for rulings upon particular questions.' Opinion letters of an agency expressing opinions as to the application of the law to particular facts presented by specific inquiries fall within this description." (General Statement as to the Effect of the Portal-to-Portal Act of 1947 on the Fair Labor Standards Act of 1938, 29 CFR section 790.17(d).)

The letter involved here is a *written* ruling or interpretation issued by the *Administrator of the Wage and Hour Division of the Department of Labor.* Said letter was written as a consequence of an individual request for a ruling upon particular questions. Particular facts were presented to the agency. This procedure falls squarely within the requirements of Section 10 of the Portal Act and the above quoted language from the cited regulation.

Furthermore, the Court feels that the meaning of said ruling is clear and consistent upon its face. It states in plain language that under the facts presented, the 13(b) (1) exemption applied to the bus drivers involved.

Under these circumstances, the Court can only conclude that the letter involved met the requirements of section 10 of the Portal Act.

■ A second question now arises; namely, whether the said ruling applied to Phillips. It must be remembered that at the time the ruling was handed down, Lost Rivers was operating the bus system.

It is undisputed that when Phillips took over from Lost Rivers the operation of the transportation system, there were no changes in the mechanics or methods of operation; the same facilities, property, and equipment were utilized; substantially all employees of Lost Rivers including all bus drivers, transferred to and became employees of Phillips without loss of seniority; and the duties performed by the bus drivers remained the same under Phillips' operation and the drivers did not interchange with other Phillips' employees.

It is further undisputed that at all times following October 1, 1953, Phillips was aware of and had copies of the rulings and interpretations previously secured in connection with the applicability of wage-hour laws to the bus drivers, including the letter of November 26, 1952 from the Administrator.

Consequently, it must be held that Phillips stood squarely in the shoes of Lost Rivers after the change-over.

Section 10 of the Portal Act provides specifically that an employer may rely upon a

"* * * written administrative regulation, order, ruling, approval, or interpretation * * * or any administrative practice or enforcement policy of such agency *with respect to the class of employers to which he belonged.*" (Emphasis added.)

It cannot seriously be doubted that Phillips belonged to the same class of employer as Lost Rivers since the evidence shows that Phillips simply took over the same bus transportation operation and bus driver employees. The Court can only conclude that the Administrator's letter ruling of November 26, 1952, applied to Phillips as well as Lost Rivers.

The third question with which the Court is faced, is whether the facts in this case establish that Phillips acted in good faith in conformity with and in reliance on the November 26 ruling of the Administrator.

It is not clear whether the "good faith" referred to in Section 10 of the Portal Act is a subjective test, an objective test, or a combination of both. Authority for all three positions has been presented to the Court. See e. g., Kam Koon Wan v. E. E. Black, Ltd., 188 F.2d 558 (9th Cir., 1951) (Objective test); Addison v. Huron Stevedoring Corp., 204 F.2d 88 (2nd Cir., 1953) (Subjective test); 29 CFR Section 790.15(a) (Combination).

 Whatever test is to be applied, it seems clear that the issue of good faith is essentially a question of fact. All of the facts and background must be reviewed.

 After a careful examination of all the evidence in this case, in the light of the requirements of Section 10, the Court is convinced and holds that Phillips has sustained the burden of proving its reliance in good faith on the ruling of the Administrator of November 26, 1952.

However, the matter may not be laid to rest at this point. The plaintiffs contend further that any good faith reliance exercised by Phillips on the Administrator's ruling was terminated sixteen months later by virtue of an actual disclaimer of jurisdiction over the bus drivers by the Interstate Commerce Commission. The alleged disclaimer is in the form of a memorandum from then Associate Chief Counsel, Murray, of the ICC, to Field Attorney, Howard, of the ICC, which answered an inquiry of whether Phillips was subject to the regulatory power of the ICC under the Motor Carrier Act. All of the facts of the bus operation were furnished to Murray. He stated in the memorandum dated March 25, 1954:

"* * *

"On the basis of these facts, I am of the opinion that these transportation activities of Phillips comprise an incidental part of the main business of operating the Reactor Station, and that as to property transportation, they would constitute private carriage under the Interstate Commerce Act, subject only to our hours of service and safety regulations. Since the Act does not apply to private carriage of passengers, the interstate passenger transportation described would be subject to no regulation by this Commission. I agree with your view that Section 203(b) (2) and Section 203(b) (9) will have no application in this situation.

"* * * *". (Exhibit 51.)

Phillips contends that the above memorandum confirms the November 26 ruling of the Administrator that the bus drivers were subject to the safety regulatory power of the ICC. Plaintiffs conversely claim that this memorandum actually disclaimed ICC jurisdiction, and Phillips could no longer rely on the November 26 ruling. Even conceding that the memorandum may suffer from some ambiguities, the Court does not feel that

it can be interpreted as an unequivocal rejection by the ICC of jurisdiction over the bus drivers. The letter specifically states that property transportation would be subject to hours of service and safety regulations of the ICC. The "interstate passenger transportation" that was subject to no regulation of the ICC, obviously referred to the operation of three passenger cars which were used for transportation of officials and employees of the AEC as a taxi service. Approximately six trips per year were made in interstate commerce. This could not have referred to the passengers the buses transported, since they were operated within the State of Idaho. Consequently, it does not appear that the memorandum was in conflict with the Administrator's ruling, and it follows that Phillips had no reason to stop relying on said ruling.

This conclusion is further supported by subsequent determinations by the Wage-Hour Division in 1957 and 1962. John M. Ekeberg, Field Office Supervisor, Department of Labor Field Office, Salt Lake City, Utah, wrote a letter to Mr. Leedy of Phillips, dated February 26, 1957, which stated:

" * * *

"Pursuant to the request you made of Investigator Charles D. Warren on February 19, 1957, this is to notify you that our findings in the recent investigation, covering the period December 27, 1954–January 6, 1957, indicate that bus drivers for whom you claimed hours exemption under section 13(b) (1) of the federal Fair Labor Standards Act were correctly so claimed.

"Our investigation disclosed compliance with the Act for all employees of the Transportation Division." (Exhibit 36.)

Again, in 1962, pursuant to a request from Amalgamated Division 1517, then collective bargaining representative for the bus drivers, to secure certain determinations from the U. S. Department of Labor in connection with the statutory rights of bus drivers to receive over-time compensation, Mr. Robertson, Regional Attorney for the Wage-Hour Division, sent a letter to Mr. Burbick, President of Amalgamated, which stated:

"In reply to your letter * * *, please be advised that upon the basis of our recent investigation prompted by your letter * * *, it is the position of this Department that the Federal laws do not require the payment of overtime on this contract for work in excess of forty hours per week. As stated in my letter, the new Work Hours Act of 1962 would not be applicable until such time as the Government contract is renegotiated. The Fair Labor Standards Act is inapplicable because of the exemption contained in Section 13(b) (1), copy enclosed.

" * * * ". (Exhibit 43.)

Thus, in the light of the original ruling from the Administrator of the Wage and Hour Division, the subsequent additional rulings from the Wage and Hour Division, and considering all of the other facts and circumstances surrounding this particular issue, it is clear that the requirements set forth in Section 10 of the Portal Act have been met in this case. It follows that Issue of Law No. 1 must be answered in the affirmative.

However, assuming for the purpose of argument that Phillips is liable for over-time compensation under Issue No. 1, the question propounded under Issue of Law No. 2 must then be met which reads:

"If liability is established for failure to compensate plaintiffs for over-time, does Sec. 11 of the Portal-to-Portal Act of 1947 (29 U.S.C. Sec. 260) relieve the defendant in whole or in part of liability to pay liquidated damages for its failure to pay overtime compensation under the Fair Labor Standards Act of 1938, as amended?"

Section 11 of the Portal Act which covers liquidated damages provides in pertinent part:

"In any action * * * to recover * * * unpaid overtime compen-

sation, or liquidated damages, under the Fair Labor Standards Act * *, if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act * * the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216(b) of this title."

Section 16(b) (29 U.S.C. § 216(b)) of the FLSA provides in pertinent part:

"(b) Any employer who violates the provisions of * * * section 207 of this title shall be liable to the employee or employees affected in the amount of * * * their unpaid overtime compensation, * * * and in an additional equal amount as liquidated damages * * *."

█ It is clear that under section 11 the employer has the burden of persuading the Court by proof that his failure to comply with the FLSA was both in good faith and predicated upon reasonable grounds.

█ The Court has decided above that Phillips met the requirements needed to come under the protection of section 10 of the Portal Act. It is quite apparent by comparing sections 10 and 11 that the former demands a greater showing by the employer in order to meet its requirements than the latter.

Thus, it seems that if in a particular case it is found that the requirements under section 10 have been met, it would follow that the good faith requirement under section 11 would also be met ipso facto.

The question in the instant case is whether the good faith element under section 11 has been met assuming that the more rigid requirements under section 10 have not.

█ After a careful review of the authorities presented by the parties and

considering all of the other circumstances as outlined under Issue of Law No. 1, the Court concludes that Phillips has clearly met the burden of proving that its omission to pay overtime compensation was in good faith and that it had reasonable grounds for believing that its omission was not a violation of the FLSA. See e. g., Van Dyke v. Bluefield Gas Co., 210 F.2d 620 (4th Cir., 1954); Bauler v. Pressed Steel Car Co., 81 F.Supp. 172 (N.D. Ill. E.D., 1948); Neal v. Braughton, 111 F.Supp. 775 (W.D. Arkansas, 1953); Foremost Dairies Inc., v. Ivey, 204 F.2d 186 (5th Cir., 1953); Craig v. Far West Engineering Co., 265 F.2d 251, 72 A.L.R.2d 1143 (9th Cir., 1959).

█ Consequently, even if it were found that Phillips did not meet the requirements of section 10 of the Portal Act, the assessment of any liquidated damages in such event would be improper and would be denied. The answer to Issue No. 2 is that defendant is relieved in whole of liability to pay liquidated damages.

The Court now turns its attention to Issue of Law No. 3, which reads:

"Does the exemption set forth in Section 13(b) (1) of the Fair Labor Standards Act (29 U.S.C. Sec. 213(b) (1)) relieve the defendant from any requirement to pay overtime compensation required by Section 7 of the Fair Labor Standards Act?"

This issue is in some respects similar to Issue No. 1 which involved the question of whether section 10 of the Portal Act was applicable which in turn depended upon the question of whether sufficient information was present to warrant good faith reliance on the part of Phillips that the 13(b) (1) exemption was applicable to the bus drivers.

Under the present issue, the Court must decide whether the 13(b) (1) exemption in fact did apply to the bus drivers.

Section 13(b) (1) of the FLSA provides basically that overtime requirements do not apply to employees to whom

the ICC has power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carrier Act.

Section 204 of the Motor Carrier Act, 49 U.S.C.A. § 304, provides in part that the Commission shall have the duty to regulate *common carriers* by motor vehicle, *contract carriers* by motor vehicle, and to establish for *private carriers of property* by motor vehicle reasonable requirements to promote safety of operation, if need therefor is found.

Phillips contends that the bus system involved here falls within the third classification, namely, private carriers of property. Thus, the Court will confine its discussion to that class only.

The parties agree that it is not necessary for the Secretary of Transportation to have actually established qualifications and maximum hours of service for the 13(b) (1) exemption to apply, but that the mere existence of his power to do so is sufficient. Levinson v. Spector Motor Service, 330 U.S. 649, 67 S.Ct. 931, 91 L.Ed. 1158 (1947).

The parties have also stipulated that during the period in question (October 1, 1953, through June 30, 1966), Phillips, with respect to all bus driver employees, adhered to the qualifications and hours of service requirements of the ICC applicable to private carriers of property by motor vehicle and adhered to the safety regulations and equipment standards applicable to such type of carriers. It is further stipulated that Phillips did not during said period file reports with any office of the ICC, nor was Phillips requested to do so by any office or officer of the ICC.

Plaintiffs advance the proposition that in order to establish the 13(b) (1) exemption, the following requirements must be met: (1) "interstate commerce" as defined by the Motor Carrier Act must be involved; (2) the employer must be an operator within the purview of said Act, and (3) the employees' activities must directly affect the safety of the operation of motor vehicles. This seems to be correct. 29 CFR section 782.2. Plaintiffs also concede that Phillips has established the third requirement, namely, that the bus driving activities of plaintiffs do directly affect the safety of the operation of those vehicles. With this the Court also agrees. Levinson v. Spector Motor Service, supra.

Consequently, the Court must face two questions in order to dispose of Issue No. 3: (1) Was the bus system involved in interstate commerce as defined by the Motor Carrier Act and (2) were the buses private carriers of property by motor vehicle subject to the Commission's jurisdiction under section 204 of said Act?

In order to answer the first question, it is necessary to briefly review the type of operation in which the bus transportation system was involved. One of the functions of the system was to transport passengers to and from the NRTS. These passengers included employees of the AEC, business and non-business visitors, and so forth. Virtually all of the passenger transporting was carried on within the State of Idaho.

In addition, certain types of property were carried by the buses and other vehicles operated by the drivers. Most of this property was in the form of mail and parcel post. It is found in reviewing the stipulated evidence that the pieces of mail (incoming and outgoing) transported between the NRTS and the U. S. Post Office by the bus drivers numbered into the hundreds of thousands per year. It is also agreed that a very substantial, if not a high majority, of this mail was received from or sent to places outside the State of Idaho.

Furthermore, it is found that all of the buses involved have always had space available for carrying property, including mail, parcel post, smaller items of freight, packages, etc.

"Interstate commerce" is defined in the Motor Carrier Act as follows:

"The term 'interstate commerce' means commerce between any place in a State and any place in another

State or between places in the same State through another State, whether such commerce moves wholly by motor vehicle or partly by motor vehicle and partly by rail, express, or water * * *" (49 U.S.C.A. § 303(a) (10)).

Plaintiffs rely heavily upon the contention that under the Motor Carrier Act interstate commerce means that there must be actual carriage of goods across state lines. Even the authorities cited by plaintiffs in support of this contention make it unmistakable that this is not an accurate statement of the law.

■ The Court finds after examining all of the evidence that plaintiffs' activities constituted a part of a continuous movement of mail and other freight from points outside the State of Idaho to the NRTS and vice versa. In the light of that Finding, the fact that the operations of the drivers were wholly within the State of Idaho is not decisive. Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1943); Morris v. McComb, 332 U.S. 422, 68 S.Ct. 131, 92 L.Ed. 44 (1947); Beggs v. Kroger Co., 167 F.2d 700 (8th Cir., 1948); Southland Corporation (Cabell's Dairy Division) v. Shew, 248 F.Supp. 12 (N.D.Texas, 1965), Aff'd in Shew v. Southland Corp., 370 F.2d 376 (5th Cir., 1966); 29 CFR section 782.7 (b) (1). The Court concludes that the activities here involved constituted "interstate commerce" within the meaning of the Motor Carrier Act.

Now the Court must decide whether the buses fall within the classification of private carriers of property by motor vehicle as defined by the Motor Carrier Act.

Section 203(a) (17) (49 U.S.C.A. § 303(a) (17)) of the Motor Carrier Act sets forth the following definition of a private carrier of property:

"The term 'private carrier of property by motor vehicle' means any person not included in the terms 'common carrier by motor vehicle' or 'contract carrier by motor vehicle', who or which transports in interstate or foreign commerce by motor vehicle property of which such person is the owner, lessee, or bailee, when such transportation is for the purpose of sale, lease, rent, or bailment, or in furtherance of any commercial enterprise."

Phillips concedes that its activities did not fall within the purview of sections 303(a) (14) and (15), which define "common carriers" and "contract carriers". However, it contends that under the facts and circumstances its operation did fall within the classification of a "private carrier of property by motor vehicle" as set forth above, and consequently was subject to hours of service and safety regulations of the ICC which in turn brought the 13(b) (1) exemption into play.

Plaintiffs, on the other hand, contend that Phillips was neither a "common", "contract", or "private" carrier.

After carefully reviewing the law in this area, it appears that no cases have dealt with like or even remotely similar factual situations that are present here. Most of the controversy in this area arises when it must be determined whether a particular transportation operation is required to obtain a certificate or permit from the ICC in order to operate legally upon the highways. In those types of cases, the ultimate issue is whether the particular operation falls within the classification of a "common", "contract", or "private" carrier. That determination, in turn, hinges upon the factual situations present, such as the type of operation, control of the vehicles, whether the transportation was "for hire", or utilized only in the furtherance of a primary business enterprise, and so forth.

In the instant case a unique situation is presented. The NRTS was established in 1949 as a place where the AEC could build, test and operate various types of nuclear reactors, allied plants and equipment with maximum safety. The objective of the NRTS is to develop safe and economical nuclear power, and to engage in related research and development.

The NRTS covers some 572,000 acres of land in southeastern Idaho. It is nearly 39 miles long from north to south, and about 36 miles wide in its broad southern part.

Private companies as operating contractors have operated the various facilities at the NRTS under principally cost-plus-fixed-fee contracts with the AEC.

No one resides at the NRTS. The permanent employees live in some thirty Idaho communities located near the NRTS. The nearest NRTS boundaries are 29 miles west of Idaho Falls, 32 miles northwest of Blackfoot, 50 miles northwest of Pocatello, and 7 miles southeast of Arco. The installations at the NRTS site are located in 9 separate major program areas.

When the operation began in 1949, the AEC attempted to interest private bus companies to provide transportation to the NRTS from various communities. A few private companies attempted to furnish this service, but in each instance the operation failed because of financial loss. Those companies were not under contracts with the AEC.

Because of the vital necessity of an adequate transportation system to and from the NRTS, as well as within it, in order to carry out the basic objectives of the NRTS, proposals were solicited by the AEC from 57 firms to operate a bus transportation system to serve the NRTS. Eleven firms submitted proposals.

In May, 1951, a cost-plus-fixed-fee contract was awarded by the AEC to Lost Rivers for a bus transportation system to be operated at AEC expense. The AEC thus undertook to furnish through its contract with Lost Rivers, an adequate transportation system which was a vital element in the efficient operation of the overall program. The transportation system was later transferred to Phillips pursuant to the decision of the AEC to consolidate certain activities under a single contractor. The mechanics and methods of operating the transportation sys-

tem serving the NRTS remained the same when Phillips took over the operation from Lost Rivers.

The contractual obligation required that Phillips

"Manage and operate an adequate and efficient transportation system to serve the National Reactor Testing Station and the Idaho Falls Operations Office in the manner and to the extent the Commission [AEC] may require from time to time." (Exhibit 2, part 1, par. 2-d of Art. II, Modification No. 3).

All of the buses and other vehicles used in connection with the transportation system were owned by the AEC. The transportation services rendered by Phillips to the various other private contractors located about the site were pursuant to the Phillips-AEC contract, and not pursuant to individual contracts between Phillips and those other contractors. The transportation facilities were never held out for the use of the general public. No fixed fees were charged for the various types of carriage provided by Phillips, and whatever fees were charged by Phillips were credited to the AEC. Although many passengers connected with the NRTS operation were transported by Phillips, its contractual obligation with the AEC was not confined only to the carriage of passengers. The fact is that substantial amounts of various types of property, including mail, were transported to and from the NRTS.

It seems clear that this property transportation constituted a vital part of the overall operation of the NRTS. It is also fair to state that said property and passengers were carried on the same vehicles at the same time in most, if not all, instances.

Under these facts, the Court can only conclude that the transportation system here involved constituted private carriage of property by motor vehicle within the meaning of the Act.

This conclusion is further supported by the statement contained in the memoran-

dum written by Associate Chief Counsel Murray, of the ICC, concerning this matter, which reads:

"On the basis of these facts, I am of the opinion that these transportation activities of Phillips comprise an incidental part of the main business of operating the Reactor Station, and that as to property transportation, they would constitute private carriage under the Interstate Commerce Act, subject only to our hours of service and safety regulations. * * *" (Exhibit 51.)

Thus, the Court finds that the transportation system was involved in interstate commerce and constituted private carriage of property within the meaning of the Motor Carrier Act. As such, the ICC had the power to establish qualifications and maximum hours of service under said Act. Consequently the exemption contained in Section 13(b) (1) of the FLSA is applicable in this case and Issue of Law No. 3 must be answered in the affirmative.

Because the principal issues under Count One of the Complaint have been disposed of by the above Findings, the Court feels it unnecessary to decide the remaining issues thereunder. Accordingly, defendant prevails as to Count One.

Prior to the submission of this matter before the Court, both parties properly reserved the right to seek an interlocutory appeal from determinations relating to issues of liability. Since the Court is of the opinion that substantial grounds exist for differences of opinion as to controlling questions of law involved in this Memorandum Decision, it seems that an interlocutory appeal as provided in Section 1292(b) of Title 28, U.S.C.A., would be proper and should be permitted.

This Memorandum Decision will serve as Findings of Fact and Conclusions of Law as provided in Rule 52, Federal Rules of Civil Procedure. Defendant will prepare, serve and lodge a proposed form of Judgment reflecting the partial nature of the determination of the cause.